1

2

3

4

5  **UNITED STATES DISTRICT COURT**

6  **DISTRICT OF NEVADA**

7

8  GRAND CANYON SKYWALK DEVELOPMENT)
   LLC, *et al.*,                      )
9                                      )
10           Plaintiffs,               )     Case Nos.:  2:15-cv-00663-JAD-GWF
                                       )                 2:13-cv-00596-JAD-GWF
11      vs.                            )
                                       )
12  DAVID JOHN CIESLAK, NICHOLAS SCUTARI )    **ORDER**
    and SCUTARI & CIESLAK PUBLIC       )
13  RELATIONS, INC.                    )
                                       )
14           Defendants.               )
    _____)
15  DAVID JOHN CIESLAK, NICHOLAS SCUTARI )    **Motion to Quash Defendant/**
    and SCUTARI & CIESLAK PUBLIC       )    **Third Party Plaintiff's Subpoena**
16  RELATIONS, INC.,                   )    **to Produce Documents, Information**
                                       )    **or Objects (#1)**
17           Third Party Plaintiffs,   )
                                       )
18      vs.                            )
                                       )
19  HUALAPAI TRIBE,                    )
                                       )
20           Third Party Defendant     )
    _____)

21

22       This matter is before the Court on Gallagher & Kennedy, P.A.'s Motion to Quash

23  Defendant/Third Party Plaintiff's Subpoena to Produce Documents, Information or Objects (#1),

24  filed on March 11, 2015.[1]  Gallagher & Kennedy brings this motion on its own behalf and on behalf

25  of the Hualapai Indian Tribe of the Hualapai Indian Reservation for whom Gallagher & Kennedy

26  serves as legal counsel.  Defendants/Third Party Plaintiffs David John Cieslak, Nicholas Peter

27

28       [1] The motion to quash was originally filed in the United States District Court for the District of
    Arizona where the subpoena was served.  On April 9, 2015, the District of Arizona transferred the motion
    to quash to this District for resolution.  *Order (#17)* in Case No.: 2:15-cv-00663-JAD-GWF.

1  Scutari and Scutari & Cieslak Public Relations, Inc. (collectively referred to as "Scutari &

2  Cieslak") filed their Opposition (#18) on April 9, 2015.  Gallagher & Kennedy filed their Reply

3  (#15) on April 6, 2015.  The Court conducted a hearing in this matter on May 20, 2015.

4                                                    **BACKGROUND**

5          This action arises out of a long-running dispute relating to the Grand Canyon Skywalk

6  ("Skywalk").  The Skywalk is a tourist attraction platform that hangs out over the western rim of

7  the Grand Canyon.  The Skywalk is located on the Hualapai Indian Reservation.  Plaintiff Grand

8  Canyon Skywalk Development, LLC ("GCSD") contracted with a tribally chartered corporation to

9  build the Skywalk and thereafter manage its operation.  During the course of the underlying

10  dispute, the Hualapai Indian Tribe passed an eminent domain ordinance to condemn GCSD's

11  contractual rights with the Hualapai Tribe.  In connection with the dispute and the anticipated

12  eminent domain action, Scutari & Cieslak entered into a "Communications and Public Relations

13  Agreement" with the Hualapai Tribe on March 1, 2011 to provide public relations services in

14  presenting the Hualapai Tribe's position to tribal members, the Native-American community, the

15  news media and the general public.  The agreement provided, among other things, that Scutari &

16  Cieslak would provide "[d]irect communications with newspaper editorial board members and key

17  reporters/editors; coordination of timely media coverage (including press releases, potential press

18  events and facility tours);" and "Ghostwritten guest columns and op-eds."  *Opposition (#18),*

19  *Exhibit C, Communications and Public Relations Agreement*, ¶ 1.  The contract also provided that

20  Scutari & Cieslak would indemnify and hold the Hualapai Tribe harmless with respect to any

21  claims or actions for libel, slander, etc., against the tribe based upon material prepared by Scutari &

22  Cieslak "except where any such claim or action may arise out of material supplied by [the Hualapai

23  Tribe] to [Scutari & Cieslak] and incorporated into material prepared by [Scutari & Cieslak]."  *Id.*,

24  ¶ 4.  The agreement also provided that the Hualapai Tribe would indemnify and hold Scutari &

25  Cieslak harmless with respect to any such claims or actions that were based upon material

26  furnished by the Hualapai Tribe or where the material created by Scutari & Cieslak was

27  substantially changed by the Hualapai Tribe.  *Id.*

28  . . .

1   On April 8, 2013, Plaintiffs filed the complaint in this action, Case No. 2:13-cv-00596-
2   JAD-GWF, against individual members of the Hualapai Tribe and Scutari & Cieslak.  Plaintiffs
3   allege that the Defendants conspired to conduct a public relations/news media campaign to falsely
4   accuse the Plaintiffs of having breached their contracts with the Hualapai Tribe, and to portray
5   Plaintiffs as disreputable business persons.  Plaintiffs allege that the individual Tribal Defendants
6   hired Scutari & Cieslak to formulate a public relations campaign against Plaintiffs and that Scutari
7   & Cieslak prepared a written "communications strategy" designed to ruin Plaintiffs' reputations
8   and turn public opinion against them.  Plaintiff allege that in accordance with the strategy, Scutari
9   & Cieslak and the individual Tribal Defendants published defamatory statements to third parties
10   including news reporters and tribal members. *Complaint (#1)*.
11   In April 2014, the Plaintiffs settled with the individual Tribal Defendants and voluntarily
12   dismissed them from this action.  Scutari & Cieslak filed an answer to Plaintiffs' complaint and a
13   third party complaint against the Hualapai Tribe on October 16, 2014.  In response to Plaintiffs'
14   complaint, Scutari & Cieslak allege, as an affirmative defense, that they acted in good faith in
15   obtaining the advice of an attorney before engaging in the conduct complained of by Plaintiffs, that
16   they disclosed all of the pertinent materials facts of which they had knowledge to the attorneys and
17   thereafter acted upon advice of counsel. *Answer to Complaint (#70)*.  The attorneys referred to in
18   this affirmative defense are attorneys employed by movant Gallagher & Kennedy.  In their
19   accompanying third party complaint against the Hualapai Tribe, Scutari & Cieslak allege that they
20   are entitled to equitable indemnity, contribution, and/or express contractual indemnity for any
21   liability they may incur to Plaintiffs arising out of the alleged publication of defamatory statements
22   and related claims.  On March 2, 2015, the Hualapai Tribe filed a motion to dismiss Scutari &
23   Cieslak's third party complaint on the grounds that the tribe is immune for suit under the doctrine
24   of tribal sovereign immunity and that the tribe has not waived its sovereign immunity to permit the
25   third party action against it. *Motion to Dismiss (#96)*.  The motion to dismiss has been fully briefed
26   and is awaiting decision by the District Court.
27   On February 12, 2015, Scutari & Cieslak served a subpoena duces tecum on Gallagher &
28   Kennedy for the production of the following categories of documents:

3

(1) Documents and electronically stored information and files regarding Gallagher & Kennedy's representation and/or communication with Scutari & Cieslak either directed to or received from Scutari & Cieslak by Gallagher & Kennedy;

(2) Any and all documents and electronically stored information and files regarding Gallagher & Kennedy's representation and/or communication with Scutari & Cieslak;

(3) A copy of all data stored, retrieved, downloaded, restored, reconstructed, removed, deleted, salvaged, regenerated and/or achieved from Gallagher & Kennedy's computer devices or storage media regarding communication between Gallagher & Kennedy and Scutari & Cieslak; and

(4) all documents relating to any communications between Scutari & Cieslak and Gallagher & Kennedy with respect to Gallagher & Kennedy's representation and/or communication with Scutari & Cieslak whether electronically stored or in the file.

*Motion to Quash (#1), Exhibit 1, Subpoena.*

Gallagher & Kennedy moves to quash the subpoena on the grounds that the Hualapai Tribe and Gallagher & Kennedy, as its counsel, cannot be required to respond to the subpoena under the doctrine of tribal sovereign immunity. Scutari & Cieslak argues that Gallagher & Kennedy is not immune from responding to the subpoena. They also argue that the Hualapai Tribe waived its sovereign immunity with respect to the discovery of the information sought in the subpoena.

In a footnote in its motion to quash, Gallagher & Kennedy asserts that it has never represented Scutari & Cieslak and that communications between Gallagher & Kennedy and the Tribe are "clearly privileged." *Motion (#1), pg. 4, n. 1.* Scutari & Cieslak has clarified that it does not seek confidential attorney-client communications between Gallagher & Kennedy and the Hualapai Tribe, but rather seeks only communications between Gallagher & Kennedy and Scutari & Cieslak which are relevant to the latter's "advice of counsel" defense. In its reply, Gallagher & Kennedy asserts that the Tribe's attorney-client privilege extends to communications between Gallagher & Kennedy and Scutari & Cieslak because the latter served as a consultant to the Tribe. *Reply (#15), pgs. 6-8.*

. . .

. . .

. . .

4

**DISCUSSION**

In *Michigan v. Bay Mills Indian Community*, ___ U.S. ___, 134 S.Ct. 2024, 2030 (2014), the Supreme Court noted that Indian tribes are domestic dependent nations that exercise inherent sovereign authority.  As dependents, the tribes are subject to plenary control by Congress.  The Constitution grants Congress power to legislate with respect to Indian tribes and yet they remain separate sovereigns pre-existing the Constitution.  Thus, unless and until Congress acts, Indian tribes retain their historic sovereign immunity which includes the common law immunity from suit traditionally enjoyed by sovereign powers.  In *Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.*, 523 U.S. 751, 118 S.Ct. 1700 (1998), the Court held that the doctrine of tribal sovereign immunity barred a lawsuit by a non-tribal commercial entity to enforce a promissory note that the tribe had entered into for the purchase of stock.  The Court held that an Indian tribe's sovereign immunity is not limited only to activities occurring on tribal lands, but also applies to the tribe's commercial activities with non-tribal parties.  The Court stated that there were reasons to doubt the wisdom of perpetuating the doctrine which, at one time, "might have been thought necessary to protect nascent tribal governments from encroachments by States.  In our interdependent and mobile society, however, tribal immunity extends beyond what is needed to safeguard tribal self-governance.  This is evident when tribes take part in the Nation's commerce. . . .  In this economic context, immunity can harm those who are unaware that they are dealing with a tribe, who do not know of tribal immunity, or who have no choice in the matter, as in the case of tort victims." 523 U.S. at 758, 118 S.Ct. at 1704.  The Court nevertheless declined to restrict the doctrine in deference to Congress's right to legislate in this area.  523 U.S. at 758-760, 118 S.Ct. at 1705.

In *Davis v. Littell*, 398 F.2d 83 (9th Cir. 1968), the Ninth Circuit held that tribal sovereign immunity barred a defamation lawsuit against a non-Indian lawyer who served as general counsel for the Navajo Tribe.  The plaintiff, who was the defendant's assistant, sued him for making allegedly defamatory statements to the Tribal Council that resulted in the termination of plaintiff's employment.  The court noted that the lawyer's position with the tribe "was not a public office in the ordinary sense.  It was employment under a contract and terminable as such."  The question,

5

1    however, was "whether it encompasses public duties, official in character."  The court noted that

2    the Tribal Code "prescribes that the office of general counsel shall 'Perform those functions

3    generally required of a General Counsel's office in organizations engaged in the administration of

4    public affairs.'"  The general counsel's duties were not limited to representing the tribe in its

5    disputes with others, but also included advice with respect to the administration of the tribe's

6    public affairs.  The court stated that "[a]n important element of appellant's complaint is that

7    defamation resulted from the manner in which appellee reported to the Tribal Council his views as

8    to the competence and integrity of appellant, a subordinate employee."  398 F.2d at 85.  The court

9    stated that these were precisely the types of duties which other courts have "regarded as requiring

10   the protection of privilege."  *Id.*  The court further stated that the fact "a tribe finds it necessary to

11   look beyond its own membership for capable legal officers, and to contract for their services,

12   should certainly not deprive it of the advantages of the rule of privilege otherwise available to it."

13   *Id.*

14        In *Stock West Corp. v. Taylor*, 942 F.2d 655 (9th Cir. 1991), however, the court held that

15   the district court erred in *prematurely* holding that a legal malpractice lawsuit against an Indian

16   tribe's general counsel was barred by tribal sovereign immunity.  The plaintiff alleged that the

17   attorney committed malpractice by issuing an opinion letter to a bank which stated that a loan

18   obtained by the tribe to finance a construction project did not require Bureau of Indian Affairs

19   ("BIA") approval.  It was subsequently determined that BIA approval was required.  The plaintiff,

20   who contracted with the tribe to build the project, alleged that it was an intended beneficiary of the

21   attorney's legal advice and had standing to sue him for malpractice.  The court distinguished *Davis*

22   *v. Littell* and other cases as follows:

23              Taylor principally relies on three cases to support the claim of official
              immunity; none is persuasive. In *Davis v. Littell,* 398 F.2d 83 (9th
24              Cir.1968), *cert. denied,* 393 U.S. 1018, 89 S.Ct. 621, 21 L.Ed.2d 562
              (1969), a tribe's general counsel was immunized from suit for
25              purportedly slanderous remarks made to the tribal council concerning
              the abilities of counsel's assistant. The counsel in this case plainly
26              was acting in his representative capacity and within the scope of his
              authority. The counsel was advising the tribal council, which was his
27              job, about the merits (or lack thereof) of a council hiree and

28

1    subordinate, which was also his business. *See id.* at 85. Without
     immunity, the counsel would have been hindered in performing his
2    functions for the tribal government.

3    In *Hardin,* the tribe, its court, its council, and various officials were
     held immune from suit brought by a disgruntled non-Indian
4    reservation resident. The dispute stemmed from the Indian
     defendants' expulsion of the resident after the resident's conviction
5    for concealing stolen federal property. Such action obviously fell
     within the Indians' official duties; in fact it was the official action of
6    expulsion of which the resident complained. 779 F.2d at 478; *see id.*
     at 479-80 (resolving the issue of official immunity in three
7    sentences). *Native Village of Tyonek v. Puckett,* 890 F.2d 1054 (9th
     Cir.1989), *vacated and remanded,* 499 U.S. 901, 111 S.Ct. 1097, 113
8    L.Ed.2d 208 (1991), is inapposite for the same reason.

9    In *Davis, Hardin,* and *Puckett,* claims were asserted against tribal
     officials for actions clearly tied to their roles in the internal
10   governance of the tribe. None of these cases even involved dealings
     with (off-reservation) third parties on behalf of the tribe, much less
11   dealings with a non-Indian third party as a member of the state bar
     and representative of a borrower.
12
     It is clear that tribe members, including officials, are amenable to suit
13   if the subject of the suit is not related to the officials' performance of
     official duties.  In *Puyallup Tribe, Inc. v. Department of Game,* 433
14   U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977), the Supreme Court
     permitted a state court "to adjudicate the rights of the individual
15   defendants" relating to fishing rights. *Id.* at 173, 97 S.Ct. at 2621.
     Those defendants, including tribal officials, *see id.* at 168 & n. 3, 97
16   S.Ct. at 2619 & n. 3, had been acting as fishermen rather than tribe
     governmental officers when engaging in the complained-of activities.
17
     Stock West's allegation in this case is that Taylor was acting as an
18   attorney, rather than as a tribal official, and owed duties to the bar
     and to interested third parties to issue a letter reflecting his best legal
19   judgment. This presents a closer question than *Puyallup Tribe,*
     because it appears that Taylor's issuance of the letter was a portion of
20   his "job responsibilities," at least as broadly construed. However, it is
     not clear that Taylor's role as counsel to the tribal corporations party
21   to the sawmill contracts is necessarily a function of Taylor's role as a
     possible "tribal official." *Cf. Evans v. McKay,* 869 F.2d 1341, 1348
22   n. 9 (9th Cir.1989) (tribal officials are not cloaked in immunity from
     federal civil rights suit to the extent they acted in concert with police
23   officers, who in turn were acting under color of state law).

24   *Stock West Corp.*, 942 F.2d at 664-665.

25        The court concluded that plaintiff was entitled to pursue detailed discovery into the nature

26   of the attorney's duties, whether those duties qualified him as a tribal official and any connection

27   between the attorney's "official" duties and the opinion letter.  The court also stated that there was

28   a possibility that the attorney would not be deserving of immunity under tribal law if the delivery of

7

1    the legal opinion could be considered egregious because the attorney knew at the time he issued the

2    opinion that it was contrary to law.  *Id.*, at 665.[2]

3          Gallagher & Kennedy argues that tribal sovereign immunity also applies to a subpoena

4    duces tecum served on an Indian tribe or its legal counsel.  In *United States v. James*, 980 F.2d

5    1314 (9th Cir. 1992), the defendant was charged with committing rape on an Indian reservation in

6    violation of 18 U.S. §§ 1151, 1153 and 2241(a).  At defendant's request, the district court issued a

7    subpoena duces tecum and order directing the tribe's director of social services to produce records

8    relating to the victim's alleged alcohol and drug problems.  The court, however, subsequently

9    granted the tribe's motion to quash the subpoena based on tribal sovereign immunity.  The Ninth

10   Circuit affirmed the district court's decision.  The court held that tribal immunity was not abrogated

11   by the federal statute that authorized the government to prosecute individual Indians for crimes

12   committed on Indian lands.  Nor did the tribe waive its sovereign immunity by voluntarily

13   producing records that the government had requested from a different tribal agency.

14         Scutari & Cieslak argue, however, that *United States v. Juvenile Male 1*, 431 F.Supp.2d

15   1012 (D.Ariz. 2006) supports their position that the subpoenas are not barred by tribal sovereign

16   immunity.  The district court in *Juvenile Male 1* enforced the defendant's subpoenas duces tecum to

17   obtain the victim's records from the tribe's youth home and social services agency which would

18   allegedly show that the victim's accusations were false.  The court distinguished *James* based on a

19   criminal defendant's Sixth Amendment right to have compulsory process for witnesses which had

20   not been asserted in *James*.  The court also stated that tribal sovereign immunity should not apply

21   to a subpoena for records served upon an employee of a tribal entity as opposed to the entity itself.

22   The court noted that "[f]ederal subpoenas routinely issue to state and federal employees to produce

23

24   _____

25        [2] In *Stock West Corp. v. Taylor*, 964 F.2d 912 (9th Cir. 1992) (en banc), the court, on rehearing,
     held that the district court correctly ruled that it was required to abstain from exercising its diversity

26   jurisdiction until the tribal courts had resolved the substantial questions of tribal sovereignty presented by
     the facts of the case.  The court also held that whether the defendant was entitled to immunity from suit

27   based on tribal sovereign immunity, required "careful study of the application of tribal laws, and tribal
     court decisions, which should have been deferred until after the tribal courts had an opportunity to resolve

28   the question.

1   official records or appear and testify in court and are fully enforceable despite any claim of

2   immunity." 431 F.Supp.2d at 1016, citing *Exxon Shipping Co. v. United States Dep't of Interior*, 34

3   F.3d 774, 778 (9th Cir. 1994).

4          Other federal circuits have addressed the scope of tribal sovereign immunity with respect to

5   subpoenas served on a non-party Indian tribe in a civil action.   In *Alltel Communications, LLC v.*

6   *DeJordy*, 675 F.3d 1100, 1105 (8th Cir. 2012), the Eighth Circuit addressed the limited issue of

7   "whether a federal court subpoena served on an Indian tribe in civil litigation in which the tribe is

8   not a party constitutes a 'suit' triggering the protections of tribal immunity."   675 F.3d at 1102.

9   The court noted that in *Dugan v. Rank*, 372 U.S. 609, 620, 83 S.Ct. 999, (1963), the Supreme Court

10  stated that "[t]he general rule is that a suit is against the sovereign if the judgment sought would

11  expend itself on the public treasury or domain, or interfere with the public administration, or if the

12  effect of the judgment would be to restrain the Government from acting or compel it to act." *Id.*

13  675 F.3d at 1102.  After discussing cases involving the sovereign immunity of federal or state

14  agencies and officials with respect to subpoenas, the court concluded as follows:

15              Although the answer to this question is far from clear, we conclude
                from the plain language of the Supreme Court's definition of "suit"
16              in *Dugan*, and from the Court's "well-established federal 'policy of
                furthering Indian self-government,'" *Santa Clara*, 436 U.S. at 62, 98
17              S.Ct. 1670, that a federal court's third party subpoena in private
                litigation is a "suit" that is subject to Indian tribal immunity.  It may
18              be that federal courts applying normal discovery principles could
                adequately protect Indian tribes from abusive third-party discovery
19              without invoking tribal immunity, *See Casino Res. Corp. v. Harrah's*
                *Entm't, Inc.*, 243 F.3d 435, 440 (8th Cir. 2001) ("the Nation (a non-
20              party) can be protected in the discovery process, *e.g.*, Fed.R.Civ.P.
                45"); *United States v. Menominee Tribal Enters.*, No 07-C-316, 2008
21              WL 2273285, at *13 (E.D.Wis. June 2, 2008); *Ho-Chunk Nation v.*
                *J.C. Penney Co., Inc.*, No. 98 C 3924, 1999 WL 1068700, at *2-3
22              (N.D.Ill. Nov. 17, 1999).  But the Supreme Court has consistently
                applied the common law doctrine even when modern economic
23              realties "might suggest a need to abrogate tribal immunity, at least as
                an overarching rule," concluding that it would leave that decision to
24              Congress. *Kiowa Tribe*, 523 U.S. at 758, 118 S.Ct. 1700.  Thus, even
                if denying Alltel the discovery it seeks in this case works some
25              inconvenience, or even injustice, "it is too late in the day, and
                certainly beyond the competence of this court to take issue with a
26              doctrine so well established." *Standing Rock Sioux Tribe*, 780 F.2d
                at 1379.
27
            *Alltel*, 675 F.3d at 1105-1106.
28

1    The Tenth Circuit more recently addressed this issue in *Bonnet v. Harvest (U.S.) Holdings,*

2   *Inc.*, 741 F.3d 1155 (10th Cir. 2014).  The plaintiffs in *Bonnett* sued various non-Indian companies

3   and individuals alleging that they caused the Indian tribe to terminate a contract with the plaintiffs.

4   The plaintiffs did not sue the tribe itself.  The plaintiffs, however, served a subpoena duces tecum

5   on the tribe requesting documents relevant to their claims against the defendants.  The court noted

6   the broad definition of "suit" in *Cohens v. Virginia*, 19 U.S. 264, 407, 6 Wheat, 264, 5 L.Ed. 257

7   (1821).  Relying on its own precedent, the Tenth Circuit concluded that a "suit" includes a

8   subpoena.  The court noted its decision in *United States v. Murdock Mach. & Eng'g Co. of Utah*,

9   81 F.3d 922, 931 (10th Cir. 1996) which stated that "the term 'suit' embodies the broad principle

10  that the government is not subject to 'legal proceedings, at law or in equity' or *'judicial process'*

11  without its consent."   The court reasoned that "[i]nterpreting the term 'suit' broadly comports with

12  the core notion of sovereign immunity that in the absence of governmental consent, the court lacks

13  jurisdiction to 'restrain the government from acting, or to compel it to act.'" *Id.*  The court also

14  cited its decision in *Becker v. Kroll*, 494 F.3d 904, 922 (10th Cir. 2007), which stated that a

15  subpoena initiates an adversary process that can command the production of documents and things

16  only after judicial process is afforded.  The court found that this statement also supports the

17  conclusion that the issuance of a subpoena in a federal civil action constitutes a "suit" within the

18  meaning of sovereign immunity from suit. *Bonnet*, 741 F.3d at 1159-60.  The court stated that

19  "[t]he logical conclusion, therefore, is that a subpoena duces tecum served directly on the Tribe,

20  regardless of whether it is a party to the underlying legal action, is a 'suit' against the Tribe,

21  triggering tribal sovereign immunity." *Id.* at 1160.

22    The Tenth Circuit stated, however, that its decision was not as broad as the Eighth Circuit's

23  decision in *Alltel Communications* which stated that tribal sovereign immunity applies to

24  subpoenas served on the tribe and also on tribal officials acting in their official capacity. The Tenth

25  Circuit stated:

26          Although we agree with the Eighth Circuit's holding as to the
            immunity enjoyed by the Tribe itself, we need not decide whether a
27          tribal official is also immune from an appropriate federal discovery
            request.  Indeed, we see no reason why an Indian tribe should be able
28          to "shut off an appropriate judicial demand for discovery" served on

1    a tribal official, rather than against the Tribe itself. *See Toughy*, 340
     U.S. at 472, 71 S.Ct. 416 (Frankfurter, J., concurring).  As such, we
2    do not share the Eighth Circuit's apprehensions over holding that a
     subpoena duces tecum served against the Tribe is itself a "suit"
3    triggering tribal sovereign immunity.

4    *Bonnet*, 741 F.3d at 1161-62.

5         In a footnote, the court stated that "under *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441

6    (1908), which applies with equal force against both state and tribal officials . . . neither a state nor a

7    tribe would appear to be immune from a discovery request served on the appropriate agency

8    official, rather than on the agency itself, although other privileges or protections may apply."

9    *Bonnet*, 741 F.3d at 11621, n. 1. The court stated that a subpoena served on a tribal official would

10   not trigger tribal sovereign immunity because "'[t]he *Ex parte Young* exception proceeds on the

11   fiction that an action against a state official seeking only prospective injunctive relief is not an

12   action against the state and, as a result, is not subject to the doctrine of sovereign immunity.'" *Id.*

13   The court did not reach this issue, however, because the subpoena at issue was served only on the

14   tribe.  The dictum in *Bonnet* is consistent with the district court's statement in *Juvenile Male 1* that

15   tribal sovereign immunity should not apply to a subpoena served on a tribal officer or employee.

16        In *Caskill Development v. Park Place Entertainment*, 206 F.R.D. 78 (S.D.N.Y. 2002), the

17   plaintiff had entered into an agreement with an Indian tribe to sell it a tract of land for a casino

18   development.  The agreement contained a provision which partially waived the tribe's sovereign

19   immunity with respect to the actions brought to interpret and enforce the agreement, but limited the

20   plaintiff's remedy to specific performance.   The tribe subsequently abrogated its business

21   relationship with the plaintiff and entered into a casino development agreement with the defendant.

22   The plaintiff sued the defendant for tortious interference with contract, tortious interference with

23   prospective business relations and unfair competition.  The plaintiff did not, however, sue the tribe

24   or any of its officers.  The plaintiff subsequently served deposition subpoenas on two tribal

25   members who had signed the agreement with plaintiff and on the tribe's executive director.  The

26   plaintiff also served deposition subpoenas on the tribe's attorneys which required them to produce

27   non-privileged documents relating to communications between the attorneys, the tribe and the

28   defendant.  The tribe's motions for protective orders and to quash the subpoenas based on tribal

1    sovereign immunity were granted by the magistrate judge.  In partly overruling the magistrate

2    judge's order, the district court recognized that the tribal members and the attorneys were covered

3    by the tribe's sovereign immunity.  The court stated that tribal sovereign immunity extends "to

4    tribal officials when acting in their official capacity and within the scope of their authority."  206

5    F.R.D. at 86, citing *Davis v. Littell, supra*, 398 F.2d at 84-85.  The court further held that this

6    immunity extends to subpoenas to tribal officials to testify or produce documents relating to their

7    official duties and within the scope of their authority.  *Id.*, at 87-88.  The court found, however, that

8    the express waiver of sovereign immunity in the agreement between plaintiff and the tribal

9    corporations was sufficiently broad to include waiver of immunity with respect to the information

10   sought in the subpoenas.

11        The court in *Caskill* did not address the application of *Ex Parte Young* to a subpoena served

12   on a tribal officer as opposed to the tribe itself.  The court relied on the decision in *United States*

13   *Environmental Protection Agency v. General Electric Co.*, 197 F.3d 592, 597 (2d Cir. 1999) which

14   upheld the quashing of a subpoena served on an individual in the office of the EPA Regional

15   Counsel.  The Second Circuit decision treated the subpoena as if it was served on the EPA itself

16   and therefore held that the agency was not required to respond on the basis of the federal

17   government's sovereign immunity.  The *Caskill* court stated:

18            The same rule should apply here, since "Indian tribes have long been
             recognized as possessing the common-law immunity from suit
19            traditionally enjoyed by sovereign powers," such as the United States.
             *See Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58, 98 S.Ct. 1670,
20            56 L.Ed.2d 106 (1978); *see also United States v. United States*
             *Fidelity and Guar. Co.,* 309 U.S. 506, 512, 60 S.Ct. 653, 84 L.Ed.
21            894 (1940); *Bishop Paiute Tribe,* 275 F.3d at 904, n. 3 (noting that
             "comparison to cases denying enforcement of state court subpoenas
22            against the United States government is ... appropriate"); *California*
             *v. Quechan Tribe of Indians,* 595 F.2d 1153, 1155 (9th Cir.1979)
23            (noting that the "sovereign immunity of Indian tribes is similar to the
             sovereign immunity of the United States"); *Sekaquaptewa v.*
24            *MacDonald,* 591 F.2d 1289, 1291 (9th Cir.1979) ("The sovereign
             immunity of Indian tribes is coextensive with that of the United
25            States.")

26        *Caskill*, 206 F.R.D. at 87-88.

27        The Ninth Circuit has held that the *Ex Parte Young* doctrine permits actions for prospective

28   non-monetary relief against state or tribal officials in their official capacity to enjoin them from

1   violating federal law.  *Salt River Project Agr. Imp. and Power v. Lee*, 672 F.3d 1171, 1181 (9th Cir.

2   2012).  The court noted that *Ex Parte Young* is not limited to claims that officials are violating the

3   federal Constitution or a federal statute.  It applies to federal common law as well.  *Id.* at 1182.

4   The court thus held that the *Ex Parte Young doctrine* applied to a suit brought by a private party to

5   obtain  prospective injunctive relief against officials of the Navajo Tribe who sought to enforce

6   tribal labor laws against the plaintiff allegedly in violation of the federal law.

7           *Davis v. Littell* and *Stock West Corp. v. Taylor*, considered together, do not indicate that a

8   lawyer or law firm are cloaked with tribal sovereign immunity based merely on the fact that they

9   represent an Indian tribe in a dispute or litigation with third persons.  The attorney in *Davis v.*

10  *Littell* was the tribe's "general counsel," which was a defined tribal office under the Tribal Code.

11  The lawsuit in that case arose out of official advice that the attorney provided to the Tribal Council

12  regarding the competence of a tribal employee.  The court in *Stock West Corp.* was unwilling,

13  however, to find that a lawyer was cloaked with tribal sovereign immunity based solely on the fact

14  that he had issued a legal opinion letter on behalf of the tribe.  The court stated that the

15  determination of whether the lawyer was entitled to immunity would depend on detailed discovery

16  into the nature of the attorney's duties, whether those duties qualified him as a tribal official and

17  any connection between the attorney's "official" duties and the opinion letter.  Gallagher &

18  Kennedy states that it represented a Tribal corporation, 'Sa' Nyu Wa, Inc. ("SNW") in negotiations

19  with GCSD to resolve the disputes.  It further states that when negotiations broke down and

20  litigation with GCSD was anticipated, the Tribe, at Gallagher & Kennedy's suggestion, retained

21  Scutari & Cieslak to provide advice about media relations and coordinate communications with the

22  media about the dispute with GCSD.  *Motion (#1), pgs. 1-2.*  There is no representation that

23  Gallagher & Kennedy served as general counsel to the Hualapai Tribe or held some other "official"

24  position in the tribe.  Gallagher & Kennedy's representations are therefore not sufficient to cloak it

25  with the Hualapai Tribe's sovereign immunity.

26          The subpoena in this case seeks documents from Gallagher & Kennedy's regarding its

27  communications with Scutari & Cieslak with respect to the allegedly defamatory statements that

28  were published about the Plaintiffs.  This Court agrees with the Tenth Circuit's view in *Bonnet v.*

13

1    *Harvest (U.S.) Holdings, Inc.*, which is also supported by *Juvenile Male 1*, that a federal civil

2    subpoena served on a individual tribal officer or employee, as opposed to the tribe itself, does not

3    trigger tribal sovereign immunity.  Therefore, even if Gallagher & Kennedy might otherwise be

4    immune from a suit for damages based on tribal sovereign immunity, the doctrine does not protect

5    or excuse it from compliance with the subpoena.

6           Scutari & Cieslak also argues that the Tribe has waived its tribal sovereign immunity.  The

7    waiver issue is presently before the District Court on the Hualapai Tribe's motion to dismiss

8    Scutari & Cieslak's Third Party Complaint.  To the extent it becomes necessary to decide the

9    waiver issue with respect to the subpoena, it is appropriate to defer that decision until the District

10   Court decides the waiver issue as it relates to the third-party complaint.

11          Scutari & Cieslak has clarified that the subpoena does not seek production of confidential

12   attorney-client communications between the Hualapai Tribe and Gallagher & Kennedy.  Gallagher

13   & Kennedy asserts in its Reply that its communications with Scutari & Cieslak are also within the

14   scope of the Tribe's attorney-client privilege.  Because that argument was only made in the Reply,

15   without any opportunity for Scutari & Cieslak to respond, the Court will not entertain it in this

16   order.  *See Poole v. Centennial Imports, Inc.*, 2014 WL 2090810, *3 (D. Nev. 2014) ("a party may

17   not raise an argument for the first time in its reply brief"); and *Halo Electronics, Inc. v. Pulse*

18   *Engineering, Inc.*, 810 F.Supp.2d 1171, 1210 (D.Nev. 2011) (same), citing *Graves v. Arpaio*, 623

19   F.3d 1043, 1048 (9th Cir. 2010).

20                                          **CONCLUSION**

21          The subpoena served on the Hualapai Tribe's attorneys, Gallagher & Kennedy, does not

22   violate Hualapai Tribe's sovereign immunity from suit and therefore is not subject to being quashed

23   on that ground.  Accordingly,

24   . . .

25   . . .

26   . . .

27   . . .

28   . . .

1     **IT IS HEREBY ORDERED** that Gallagher & Kennedy, P.A.'s Motion to Quash

2   Defendant/Third Party Plaintiff's Subpoena to Produce Documents, Information or Objects (#1) is

3   **denied**.

4     DATED this 5th day of June, 2015.

5

6

7   GEORGE FOLEY, JR.
    United States Magistrate Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28